Our second case for this morning is Brotherhood of Locomotive Engineers and Trainmen v. Union Pacific Railroad Company. Brotherhood of Locomotive Engineers and Trainmen v. Union Pacific Railroad Company Just watch your lights when the white one turns on, that's it. This case is really quite different than any of the other Railway Labor Act disputes that I've worked on before this court and in the District Court in the sense that the parties agree there's no express contract. Usually what happens in these cases is there's a contract, the Union thinks it's clear, and the Railroad comes forward with an at least arguable interpretation of it. My clients can question the good faith of that, at least an arguable interpretation lots of times, but we don't have that here. There's simply no express contract, and the parties agree on that. Can I just quibble with you a little bit about that? Yes, Judge. I understood that there is, actually there's quite a few collective bargaining agreements in play here, right? On some aspects of the case, yes. Okay, so I thought the issue here is whether in those agreements there is an implied power for the Railroad to take these steps regarding discipline. I disagree with that, Judge. Okay, please. I don't think that Union Pacific has identified any specific contract language that gives it the right to implement these changes. I agree. They have not. The question, they're arguing they've got a past practice, right? Yes, Judge. Okay. Right, right, and I have exactly the same question. which, particularly in collective bargaining environments, the parties' custom and practice of dealing with one another is an important part of the relationship, and it's created under the umbrella of the collective bargaining agreement. Let me ask a question this way. We have Mr. Phillips' affidavit, right, from the Railroad. Yes. That asserts we've got this power, we've used this power before, and so on. We have your affidavits that take a different approach. Everybody's affidavits look as if they are very carefully worded. So let me ask whether you believe that the Phillips' affidavit is false. In which aspect, Judge? Any. Yes. Okay. Could you identify those? I do not believe that the Railroad has reserved a right to make unilateral changes in the absence of an express collective bargaining agreement to the contrary. Could you be? That's, in essence, the ultimate conclusion. That's one of his statements. Okay. Is it factually false in any respect? Let me put it that way. In that respect? Does it make factual assertions about the history of the relationship between the union and the Railroad? I think they're incomplete, Your Honor. Mr. Phillips may have testified, with the exception that I just highlighted, where that was a specific averment he made. As a matter of fact, I disagree that that is true. We could say he made a conclusion of law. But with respect to his laying out a history of arbitration awards, that's accurate, if that's what you're driving at. I'm driving at the whole thing. I'm trying to understand how we should approach this problem where we have these dueling affidavits. And in particular, one question for the Railroad, in essence, is can a Railroad get to arbitration by lying about the history? Okay? Which I think is the position the Railroad is taking, but I don't know whether that actually needs to be decided in this case. Well, let me try to answer your question by bringing it back to some basic Railway Labor Act precedents, Your Honor. Of course, we have the minor-major dispute dichotomy under the Railway Labor Act. Major disputes, it's been clear for a real long time, are about contract formation. So here, if you think about it, we're saying on the broader Section 2 First issue, that's 45 U.S.C. Section 152 First of the Railway Labor Act. And I'll come back to that for a second so we can read the statute together. But under the minor-major dispute dichotomy, a minor dispute is about the meaning of a contract. The meaning of a contract. A major dispute is about whether a contract exists. We highlighted this in the Detroit TSL in our case. It went all the way up to the Supreme Court and was affirmed. This case is about, in Union Pacific's defense to it, they come in and say, we're not pointing to a contract that gives us this power. We're not saying there's anything for the arbitrator to interpret if you send it to the Section 3 Railway Labor Act minor dispute process. What they are saying is, there's nothing to interpret. But we have an implied-in-fact contract. And we're saying, you do not have an implied-in-fact contract. And that then becomes a dispute about the formation of a contract. A dispute about the existence of a contract. Does your position then depend upon the difference between an implied creation of a contract and an implied term of a contract that already exists? It's unclear to me which one of those would be the case, Your Honor, because, you know, you can have a contract that has ten terms, and that's a contract. You can have a contract that has ten terms and only one of them is relevant, and then you're looking at that term. Under the Railway Labor Act, our contracts don't expire. We've had disputes, you know, seven years ago over the 1952 laying off and leave of absence agreement that came up in this court. So you have a piecemeal set of agreements that weren't even negotiated by the same parties because of railway mergers. So you have agreements between the Southern Pacific and one part of the BLE, the Missouri Pacific. Those are all now Union Pacific agreements. So under the Railway Labor Act, the idea of, you know, what's the collective bargaining agreement is a little bit different than under the National Labor Relations Act, and I don't know if that answered your question. I don't know if it does either, but it's helpful. So let me come at this maybe from a slightly different point of view. We have the underlying issue. You know, what are the terms? I'll just say for the time being, what are the terms of this contract? Contract is one of the terms by custom and practice, the ability of Union Pacific to change disciplinary things. The district court thought that once you had competing factual positions with an important caveat I'm going to mention, that enough was to send you over to arbitration, that you needed that. That turned it into a minor dispute, and, of course, the arbitrator might decide that the term's in the contract or it's out of the contract or the practice is different. And so taking some language from the Conrail case, the district court said that Union Pacific didn't have to prove the term. It only needs to articulate an argument that is, and here's the quote, that is neither obviously insubstantial or frivolous nor made in bad faith, close quote. Now, I would assume out-and-out lies, you know, are made in bad faith. And so that, if there's some way of pinning them down to a lie, that surely would not be enough to throw it over to arbitration. But the district court didn't seem to think that that was what it was looking at. It has these various affidavits and information in front of it. And so this case strikes me as one about who is going to decide these things. Are these things that the court needs to decide first, or is the thumb so heavily on the side of characterizing something as a minor dispute that the district court was right, this wasn't obviously insubstantial or frivolous or in bad faith, thus off to the arbitrator you go. Let me briefly distinguish that passage in Conrail and then address where the district court erred in its analysis of the comparative competencies between the courts and arbitrators. Conrail decision, if you remember, involved an interpretation of a contract. The parties undisputed that Rule G was an implied, in fact, term of the contract. So that passage that you just read from the district court, it's about whether there's an arguable interpretation of a meaning of a contract. That's a very different question than what we have here, which is, is there an argument that a contract exists, which under the Elgin case in the Supreme Court going back 60 years and the Detroit TSLNR case says is a major dispute when it's about contract. So arguing about whether a contract exists or about, I mean, you have collective bargaining agreements. I didn't think you were. But no one is offering an interpretation of one of those contracts to justify Union Pacific's position that it has a reserve management right. Okay, so we're off in this world of the implicit, yeah. So to get back to the district court's error, if you look at the comparative competencies between a federal court and an arbitrator in the context of arbitration, and I think that's really what we're talking about here, in the specific context of the Railway Labor Act, we're talking about arbitration. Courts decide if a contract exists that requires the parties to go to arbitration. Right. If you look at how the SRA works, if you look under Granite Rock, that's what all these cases say. Arbitrators decide the meaning of a contract. And the district court said, if you can at least throw up some arguable basis that maybe some arbitrator could decide a contract exists, then it goes to arbitration. In my view, the court abrogated its duty to decide whether there's a contract that requires arbitration. So my question for you, actually, in part related to this, is whether you could point me to any cases that you think got it right, that you think show a court making all of these preliminary determinations, resolving these issues of fact, and then saying at the end of the line, okay, here we have whatever it is, a major or a minor dispute. Granite Rock would stand for this principle. I don't have the facts of that specifically, but I'd say if you jump into Lexis and look at any court order that compels arbitration, the Federal Arbitration Act would make that analysis. It would make findings of fact, conclusions of law. What were the terms of the agreement? Was there offer of acceptance consideration? No, I'm familiar with the Federal Arbitration Act, and typically, unless the parties have done otherwise, which the first securities and Kaplan case said, of course, it's for the court to decide if there is an agreement to arbitrate. And then off you go to arbitration if the court says yes. Occasionally, the arbitrators decide that. There's no delegation clause here. Right. But in this instance, I'm just wondering when you wind up with these competing factual assertions about the course of business between the railroad and the union here, are there cases that have said, well, that's up to the court to resolve to see if this you've been characterizing as a management rights clause, basically. Is there an implicit management rights reservation on the discipline point? That's, I guess, what we're talking about. One point that the parties have briefed, Your Honor, is the Brack v. Atchison Topeka case that Union Pacific relies upon. And I point out that case because it's clear that the district court went into some analysis in that instance as to whether the union had acquiesced to the practice. And that's something that I want to come back to the language of the statute and then segue into the Chicago Tribune case. The language of Section 2, First of the Railway Labor Act says, it shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements. The duty is right there, and I'm reading the statute, Your Honor, to say you've got to make agreements. And Judge Wood, if we look back to your dissent in the BMW v. Atchison Topeka case, there's good reasons that you want written collective bargaining agreements. You don't want these secret side letters that the rank and file don't know about. Regrettably, it was a dissent, but there you are. You don't want nebulous practices floating out there that maybe there's a contract, maybe there's not, particularly in light of what is described by the Supreme Court of the heart of the Railway Labor Act as the duty to make these agreements. And unless Union Pacific can show that my client clearly and unmistakably waived its right to demand that they make agreements over mandatory subjects of bargaining, we've got that right that is Congress enshrined in the Railway Labor Act. I'd like to reserve some time, Your Honor. Certainly. Thank you. Mr. Monroe. Good morning. Donald Monroe for Union Pacific. This is a straightforward inquiry that this court has addressed any number of times. I didn't think it was all that straightforward, and I was disturbed by your argument that any time there's silence in a collective bargaining agreement, that automatically means that management gets to do whatever it wants, because it seems to me that's quite contrary to both the recognition in the Railway Labor Act that there are mandatory statutory subjects of bargaining and the fact that what winds up in a contract is the result of bargaining. I don't think you can draw that inference from silence. First of all, Your Honor, you don't need to reach the question in this case as to whether contractual silence standing alone would be sufficient. You can see that's not a supportable proposition. I absolutely disagree, Your Honor. If I came into this court with nothing but contractual silence, it would absolutely be an arguable position, and the reason for that is that I have literally dozens of arbitration awards that recognize that that is the rule in this industry. Now, I concede it is not the rule in other industries. Lytton Financial and the National Labor Relations Act has a different rule, but this court has on multiple occasions recognized that contractual silence alone is the default, allows a railroad to do what it wishes unless it is bound by an express provision. I think, well, I mean, I wouldn't push this too hard if I were you because I really think there are distinctions in a lot of these cases, but as you just said, I do understand that your backup argument is that you have more than silence, that you have some indication of past practices, implicit terms, that are actually terms in this contract. I can point to three different things, Your Honor. Number one, with respect to past practice, I have not just my witness's sworn statement saying that we have a longstanding practice of modifying disciplinary policy. This is this upgrade policy that had been modified? There's two examples that he cites, Your Honor. Upgrade is one of them, which is the predecessor to the policy that we're talking about now. MAPS. Correct. That policy was entered without bargaining. They complained about it, but it went ahead. They never had the right to bargain about that. What counts as bargaining? You've got exchanges. You've got posturing. You've got correspondence. Maybe there's modification, but it's not bargaining, says the railroad, right? Correct. Looks a lot like bargaining to me. Well, this is one of those things where you know it when you see it, Your Honor. Bargaining under the Railway Labor Act is something that has the potential to produce an agreement, and the railroad and the union talk all the time about all different avenues. As in a written agreement that has both signatures on the same piece of paper or an exchange of correspondence or a telephone exchange? Bargaining can be informal, there's no doubt about that, but it is something that the railroad has to be able to say to the union, we will talk to you about this, but we're not bargaining about it. That happens all the time. The railroad reserves its right to say, look, we're going to try to work this out because we're bound together, right? We're permanent partners in this, but we're not going to give away our rights to do the kinds of things that we've been doing for a century. So the example that Mr. Phillips points to is not just upgrade. Probably the more pertinent one is the attendance policy, which was litigated in this court. Judge Hamilton, you wrote the decision in that case where Union Pacific instituted an entirely new attendance policy, which has disciplinary consequences and so therefore is analogous to MAPS, and the union sued us. It was deemed a minor dispute. We went to arbitration. We won in arbitration partly on the basis of our reserved rights, exactly the argument I'm making here. They came to this court and said that was beyond his jurisdiction. He can't do that. He can't cite to some amorphous concept of reserved rights, and this court said no, of course he can. An arbitrator can do that. It happens all the time. So that leads me to my second point. Aside from those two examples, the attendance policy and MAPS, I have this entire body of arbitration authority. I'm not just pointing to contractual silence. I'm pointing to a concrete set of awards that say you can do things like impose fitness for duty exams, create absenteeism policies, do all kinds of things so long as you are not restricted by express agreement terms. How can it be frivolous for me to argue that we have the right to do exactly that? Well, I mean, the question is how far does it go? Because there are certain subjects of mandatory bargaining, and in a sense we're really talking about how and where does the bargaining happen? Because if it's a major dispute, you can't implement it right away. You've got to go to the table, thrash it out with the union. However bargaining works, maybe give up a little bit, maybe get things you want, and only then do you implement it. Whereas if it's minor, you can implement this right away. Of course, they can take it to arbitration if they want. The arbitrator, looking at the agreements, looking at industry practice, looking at what the relationship between these two particular entities has been, doing all the things that arbitrators do, will decide whether this particular MAPS policy, I mean, so in other words, in some ways you're sort of not out of the woods yet. An arbitrator could decide that the MAPS policy is, that it's just too much of a stretch to say that it's a change in upgrade, that it's just a new policy altogether, in which case you'd have to bargain it. Correct, yes, absolutely. No, an arbitrator could easily, as you pointed out, Judge Wood, in your remarks to my friend Mr. Pursoon, this is about who decides. Right, yeah. But the reason why the unions keep coming back to the federal courts about this is they know that the courts aren't steeped in the minutia and the detail of the railroad world. Very true. And God knows you don't want to be. But that's why the Supreme Court said we want this, and excuse me for the anachronistic statement, but it should be decided by railroad men. And what they meant is arbitrators who are steeped in this, who deal with this day in and day out, they know what reserved rights are in this industry. That's why there's all these awards. How about a case where the railroad says, we have an implied right to take emergency actions, and the emergency actions require a 10 percent pay cut for unionized workers, executives, everybody, and we're imposing that unilaterally. We assert that we've got this implied right. Minor or major? It would depend on the content of the express agreements between the parties, Your Honor, because I think everyone understands that, and I'm not arguing otherwise, that implied rights are restricted by express agreements. So if the agreement said you must pay locomotive engineers $35 an hour. Presumably it does. Okay, then I can't say. But it's silent about emergency powers. I think that could be a minor dispute, Your Honor, but it would depend on the specific facts. Haven't railroads made such sorts of arguments before about implied emergency powers? I can think of one case in which they did. It was the Wheeling-Lake Erie case in the Sixth Circuit. And in that case they said, well, we have an emergency power to operate locomotives with management crews without putting a locomotive engineer on it. And the Sixth Circuit said, no, that's a major dispute. But the reason it said it's a major dispute is because there was express contract language that said, no, you must have an engineer on every train. That's the difference. See what Judge Hamilton's getting at. I'm sure your contracts say, whether it's $35 an hour or whatever it is, we'll call it that, this is how much you have to pay. And yet there could be some ghastly situation that might cause the need to pay less. But you'd have to negotiate that. First of all, it's a statutory, mandatory subject of bargaining. And secondly, there's almost certainly an express clause. Right. But the difference here is there is no express clause that restricts our rights on this point. Moreover, this whole mandatory subject of bargaining thing is a complete red herring because all minor disputes are about mandatory subjects of bargaining. I can't think of a single one that didn't involve a mandatory subject of bargaining. All that the designation of it as a mandatory subject of bargaining means is that they serve a Section 6 notice on us. We are statutorily obligated to talk to them about it. If they want to come in and say, here is our Section 6 notice. We want to restrict your rights to change discipline. We think discipline should include these sanctions for these rules, and that's it, and you can't change it. They can serve that notice. So is it your position that management rights clauses in these contracts are just so much wasted words? I mean, you're essentially saying there's always a management rights clause, and I'm dubious about that, but I just want to get your position. Your Honor, I'm not aware of any express management rights clause in the railroad industry. And the reason for that is because they're all implied. Management rights clauses exist in airlines, in health care. Airlines are under the Railway Labor Act. Sure, but they have a completely different history. Well, but they're under the same statute. It's not a statutory difference. Of course, but trust me, the statutory language is the only thing that's the same thing between airlines and railroads. They do not have our longstanding history of this preserved rights doctrine, which again, this court has recognized. Judge Posner recognized this doctrine in the Duck Creek South case. I know that the lower court said that he was talking about management prerogatives, but he talks about both. First, he talks about management prerogatives, which means what color you're going to paint the executive dining room, and then he goes on to talk about the meaning of the agreements. And what he says is if the agreement does not expressly or impliably restrict the railroad, it's allowed to do it. So what happens, counsel, if the union comes back in response to an affidavit like Mr. Phillips and says he's lying? Well, again, I think you have to fall back on the Conrail standard there, Your Honor. If Mr. Phillips had testified in his declaration that we have an agreement with the union that lets us discipline employees by making them stand out in the rain, and we can do that whenever we want, and then the union comes in and says, look, here is a document that says you can't do that, and we don't have any rebuttal, I can see that there could be circumstances where the railroad's factual presentation to the district court could be deemed frivolous, because it's just so unsubstantiated. They've totally rebutted what we have to say, and we have no response. Could the judge have an evidentiary hearing on that? I think in some circumstances, if it's a close enough case, you could have an evidentiary hearing. In fact, there frequently are in circumstances where there's a strike threat, which we didn't have here. The difference here is that Mr. Phillips' essential point and the examples that he pointed to were unrebutted by the union. What they came in with is testimony about a bunch of other stuff, training and procedural rights, which have nothing to do with discipline policy. They did not point to a single circumstance in which we had entered into an agreement restricting our rights about discipline policy. None of their evidence addresses that. Let me ask you about this notion of reserved rights. Can you point to statutory language that provides that? The Railway Labor Act is silent on all substantive terms, so no. This is something that is a function of railroad history and the development of these agreements over a century. I've forgotten the exact name, but Section 18 of the Western Agreement? Correct. I guess I still struggle with how past information about license revocations is not information concerning discipline when it is being used as a basis for discipline. It's not being used as a basis for discipline, Your Honor. The discipline is based on whatever rule the individual is accused of violating. Doesn't that shave things pretty finely? It is actually the relevant fact that you're looking at under that rule. No, I disagree, Your Honor. You're saying that sanctions depend on history, right? I'm saying that once the railroad has made a determination that there's been a violation, then the degree of sanction will depend on the employee's work history. But information concerning discipline under Article 18 is referring to the substantive violation. In other words, the rule that was broken and the evidence submitted, and the policy that we're arguing about here recognizes the distinction between that and license revocation. 3.2.1 addresses license revocation and how that's treated. 3.3 is the retention period for substantiated charges. That's information concerning discipline, and that's totally compliant with Article 18. Moreover, Article 18 is referring to information concerning discipline contained in personal records. They couldn't have been referring to license revocations because they're not personal records. In any event, we're down in the weeds about contract interpretation at this point. It's surely minor. Well, the question seems to me whether the railroad wins as long as its lawyer can stand up without collapsing in laughter as he makes the argument, right? Isn't that your interpretation of Conrail? Well, Your Honor, I have attempted. I'm sorry, I see my time has expired. Please answer Judge Hamilton's question. I've attempted at various times to convince appellate courts to add some more content to what frivolous means because I'm frequently accused of making frivolous arguments, and it would be nice to have some additional. . . I'm not sure that's such a great thing, Mr. Munro. It would be nice to have some more explication of what the standard is rather than just what my. . . Well, that means you're a good stand-up comedian or whether it means that you're making. . . I think what it means is that if I were here on the merits, would you sanction me under Rule 38 for making the argument that I just made? A low bar, but. . . It is a low bar, Your Honor. All right, thank you very much. Mr. Pursoon, anything further? Thank you, Your Honor, very quickly. On the question of what the district court can do, remember that there's no discovery into this. There's no hearing. This was all on a 12B1 motion to dismiss for lack of jurisdiction. With respect to the judicial precedent, Union Pacific cited no case like this. Every case that it cited, BMW v. Norfolk Southern, BMW v. Atchison-Topeka, BMW v. BNSF, BRAC v. Atchison-Topeka, none of them involved the Section 2 first argument that we're making. It was specifically waived in the Norfolk Southern case, which involved a contract interpretation as to whether the procedures were fair and impartial. The Atchison case, that involved parole evidence used to interpret a contract. The BNSF case didn't involve a mandatory subject to bargaining. The BRAC case, there actually was some real evidence that the union had acquiesced to this practice, and it didn't involve a Section 2 first argument. So there's really no precedent cited that's on point. And with respect to the arbitral authority on it, may I briefly finish? Certainly. There's a story about a yogi in India who's asked by one of his followers, what holds up the world? He says, an elephant. And then the follower says, well, what holds up that elephant? And the yogi says, an elephant, and so on and so forth. Finally, the yogi gets exasperated and he says, it's elephants all the way down. But he never explains what's holding it up. That's what we've got here. There's a bunch of arbitrations, most of which don't even involve engineers. They involve yardmen under the 4th Division, the NRAB. Most of which don't involve my clients. And they just have this mystical idea out of thin air that the railroad doesn't have to negotiate a management rights clause, which they vary. It's not like there's a standard management rights clause. So you think there are management rights clauses in railway CBAs? I don't know of something that's expressly called a management rights clause. But they could certainly negotiate one that would have specific terms. And I can tell you from representing other industries and other clients, management rights clauses are not uniform. And where these holdings just stand in direct violation to the mandate of Section 2.1 of the Railway Labor Act to exert all efforts to make agreements. Thank you, Your Honor. All right. Thank you. Thanks to both counsel. We'll take the case under advisement.